**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

BRIDGET WALKER, et al.,

    Plaintiffs,

v.                                                                     Case No. 10-12596

DETROIT PUBLIC SCHOOL DISTRICT, et al.,

    Defendants.
                                                   /

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION TO AMEND THE COMPLAINT, DIRECTING PLAINTIFFS TO FILE THE SECOND AMENDED COMPLAINT, AND GRANTING DEFENDANT DPS'S MOTION TO DISMISS**

Before the court are Plaintiffs' motion to amend the complaint and Defendant Detroit Public School District's ("DPS") motion to dismiss. The court held a hearing on the motion to dismiss on November 17, 2010. The court will grant the motion to amend the complaint, and will also grant the motion to dismiss.

### I. BACKGROUND[1]

In the afternoon of October 16, 2008, a gunman opened fire at Henry Ford High School in Detroit, killing Christopher Walker and wounding three other students. (*See* Compl. ¶¶ 7, 30.) *See also* George Hunter, Jennifer Mrozowski & Oralandar Brand-Williams, *1 dead, 3 shot near Detroit School*, The Detroit News, Oct. 17, 2008, at 1A. This litigation arises out of that incident. The complaint asserts the following facts, among others, in its common allegations: Defendants Derryck Brantley, Devon Bell, and

---

[1] Because the court will grant the motion to amend the complaint, the facts contained herein are drawn from Plaintiffs' second amended complaint. Further, because the court here reviews a motion to dismiss, all of Plaintiffs' alleged facts are assumed to be true.

William Morton "negligently and intentionally shot Plaintiffs." (Compl. ¶ 7.) Brantley, Bell, and Morton "were known gang member [sic] that would bring guns and other firearms and/or weapons onto school premises," and assaulted Walker shortly before the shooting. (*Id.* ¶¶ 10, 12.) "Defendants DPS, Sharon Dennis, Carmen Evans and Colin Lowery were aware of said feud, threats, gang activity and/or violence, and the presence of guns and other firearms/weapons on DPS premises," and had "actual notice" of the threat of violence. (*Id.* ¶¶ 11, 14 (emphasis removed).) DPS, Dennis, Evans, and Lowery "took no action, including failing to expel or suspend" Brantley, Bell, and Morton. (*Id.* ¶ 17.) "Plaintiffs Malik Slater, Leon Merriweather, Kejuana Maccants and Christopher Walker . . . had a public and constitutional right to attend public school" and also "to be secure at school." (*Id.* ¶¶ 19-20 (emphasis removed).)

The complaint brings five claims: two 42 U.S.C. § 1983 counts, entitled "substantive due process" and "state created danger," respectively, as well as three state counts of assault and battery, gross negligence, and public nuisance. Defendant DPS is implicated under all counts except for Count I, "assault and battery," and therefore the motion to dismiss addresses only Counts II, III, IV, and V. In the § 1983 substantive due process count, the complaint provides:

> [T]here existed a custom and/or practice by Defendants, DPS, Sharon Dennis, Colin Lowery and Carmen Evans of failing to receive, investigate and act upon actions, threats and/or violence involving gangs, guns[,] weapons, fighting and/or violence, and that custom and/or practice showed a continuing, widespread, persistent pattern of unconstitutional misconduct.

(*Id.* ¶ 46 (emphasis removed).) And also: "Plaintiffs were in a custodial relationship with Defendants DPS, Sharon Dennis, Colin Lowery and Carmen Evans." (*Id.* ¶ 43

(emphasis removed).) Under the § 1983 state-created danger count, the complaint avers that

> Defendant DPS merged two high schools . . . shortly before the shootings.
>
> . . . [S]aid school merger was done by Defendant DPS with actual notice of rival gang and gang related violence in the schools.
>
> . . . Defendant DPS knew or should have known the merger would create gang violence, shootings and danger within Henry Ford High School.
>
> . . . Defendant knew or should have known of the danger it had created for the student population and Plaintiffs in particular when the two schools were merged.
>
> . . . [T]he gang related violence began almost immediately upon the merger and was prevalent and consistent up until the time of said shooting of the Plaintiffs.

(*Id.* ¶¶ 52-56.)[2]

## II. STANDARD

### A. Amending a Complaint

A plaintiff may amend a complaint "once as a matter of course," Fed. R. Civ. P. 15(a)(1), and "[i]n all other cases . . . only with the opposing party's written consent or the court's leave," Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

### B. Motion to Dismiss

To obtain dismissal of a case for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), the complaint must fail to set forth "enough facts to state a

---

[2] Plaintiffs' second amended complaint contains two paragraphs numbered "51" and two paragraphs numbered "52." In this opinion, citations to paragraph 52 are to the second paragraph 52.

3

claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Id.* at 555 (citations omitted). The Court explained the standard in *Ashcroft v. Iqbal*:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief."
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

129 S. Ct. 1937, 1949-50 (2009) (citations omitted). Therefore, under the pleading standard outlined in *Twombly*, the court assumes the *facts* recited in the complaint are true, "construe[s] the complaint in the light most favorable to plaintiff," and determines whether a plaintiff has stated a *plausible* claim. *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010) (internal quotation marks and citations omitted).

4

## III. DISCUSSION

### A. Plaintiffs' Motion to Amend the Complaint

Plaintiffs have moved to amend their complaint for the second time. During a September 13, 2010, telephone conference with counsel for Plaintiffs and Defendant DPS, Defendant DPS informed the court that it would not stipulate to a second amendment of the complaint. Therefore, Plaintiffs may amend the complaint only with the court's leave, which will be given "when justice so requires." Fed. R. Civ. P. 15(a)(2).

Plaintiffs seek to amend their complaint, in part, to ensure "that all of the parties are properly named and served" and to "fully exercise[ their] legal rights in seeking compensation." (Pls.' Mot. ¶ 11.) Defendants have not filed a response to Plaintiffs' motion, and only Defendant DPS addresses the motion in its motion to dismiss, arguing that any "amendment would be futile." (Def.'s Mot. 5.) The court finds that Plaintiffs' proffered reasons justify a grant of leave to amend the complaint a second time. Therefore the court will grant the motion.

### B. Defendant DPS's Motion to Dismiss

Defendant DPS has moved the court for an order dismissing the case against it,[3] arguing that Plaintiff has failed to state a claim upon which relief may be granted. The court will review DPS's attack of the state and federal claims in turn.

---

[3] DPS filed its motion to dismiss after Plaintiffs filed the pending motion to amend the complaint. In its motion, DPS directly addresses Plaintiffs' proposed amendments. Accordingly, the motion to dismiss is ripe for adjudication even though leave had not been given to amend the complaint at the time DPS filed its motion.

*1. Gross Negligence and Public Nuisance*

DPS first argues that it is immune from tort liability under Mich. Comp. Laws § 691.1407(1) because a school district operating a public school is a "governmental agency" engaged in a "governmental function." (Def.'s Mot. 3.) DPS further argues that there is no public nuisance exception to governmental immunity. (*Id.* at 6.) Although it does not change the plausibility standard used by the court to assess Plaintiffs' complaint, it is worth noting that Plaintiffs' response does not rebut either of these arguments.

Mich. Comp. Laws § 691.1407(1) recites:

(1) Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act does not modify or restrict the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.

DPS is correct that it is "absolutely immune" from claims of gross negligence and public nuisance under Michigan law. "[A] school district is a level of government of the type contemplated by the Legislature in the statute regarding absolute governmental immunity." *Nalepa v. Plymouth-Canton Cmty. Sch. Dist.*, 525 N.W.2d 897, 901 (Mich. Ct. App. 1994). "[T]he gross-negligence exception to governmental immunity applies only to individual public officers and employees, not to governmental agencies." *Holmes v. City of Detroit*, No. 276949, 2008 WL 821591, at *6 (Mich. Ct. App. 2008) (citing *Gracey v. Wayne Cnty. Clerk*, 540 N.W.2d 710, 714 (Mich. Ct. App. 1995), *overruled in part on other grounds by Am. Transmissions, Inc. v. Attorney General*, 560 N.W.2d 50, 53 (Mich. 1997)).

Additionally, § 691.1407(1) immunity bars public nuisance suits against the State. *Li v. Feldt*, 487 N.W.2d 127, 134 (Mich. 1992); *Summers v. City of Detroit*, 520 N.W.2d 356, 358 (Mich. Ct. App. 1994). Therefore, because DPS is a government agency and the operation of a school is a government function, DPS is immune from these state law claims. Accordingly, Plaintiffs have failed to state a state-law claim upon which relief can be granted.

The court will grant the motion to dismiss on Counts II and V of gross negligence and public nuisance, respectively, as to Defendant DPS.

### *2. Section 1983*

Municipal governments and their agencies are liable under § 1983 for torts of constitutional dimension, with the limitation that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (emphasis in original). Therefore, municipalities are liable only if some "official policy" or custom is the "moving force" behind a harm. *Id.* at 694. In order to prove the policy or custom, "[t]he plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). In asserting that the policy is of this final type, a "custom of tolerance . . . of federal rights violations," to successfully recover on a so-called "inaction theory," a plaintiff must prove:

(1) the existence of a clear and persistent pattern of [illegal activity];

> (2) notice or constructive notice on the part of the [defendant];
>
> (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
>
> (4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation.

*Id.* (citing *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).

Further, a municipality has no affirmative duty imposed on it by the Due Process Clause of the Fourteenth Amendment to protect its residents from harms caused by private actors absent some custodial or "special" relationship. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 198-200 (1989). However, *DeShaney* left open the possibility that a municipality can be held liable if it takes an affirmative action that leads to a special risk of harm to a specifically-defined group. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998). This type of liability is referred to as a "state-created danger" theory of liability.

Plaintiffs here allege violations of their substantive due process rights guaranteed by the Fourteenth Amendment, which are cognizable claims under § 1983. *See, e.g.*, *Kallstrom*, 136 F.3d at 1062-63. Although Plaintiffs' theories do not precisely align with their counts, Plaintiffs in essence raise three § 1983 theories of liability under which they might recover from DPS: 1) there existed a *Monell* custom or practice of failing to investigate violence, 2) DPS had a custodial relationship with Plaintiffs and therefore owed Plaintiffs a duty to protect them from violence, and 3) merging two schools was an affirmative act that qualifies as a state-created danger. The first two theories appear under Count III, "substantive due process." The third is under Count IV, "state created danger." The court will address each in turn.

a. Custom of Inaction

As described above, the complaint alleges that "there existed a custom and/or practice by . . . DPS . . . of failing to receive, investigate and act upon actions, threats and/or violence involving gangs, guns[,] weapons, fighting and/or violence, and that custom and/or practice showed a continuing, widespread, persistent pattern of unconstitutional misconduct." (Compl. ¶ 46.) DPS characterizes the complaint as failing to allege facts sufficient to demonstrate such a custom. (Def.'s Mot. 4-5.)

The complaint avers that there was a pattern of threats and violence, (Compl. ¶¶ 8-10), that DPS had actual notice, (Compl. ¶¶ 11, 37(I-j), 53), that there was a custom by DPS of failure to investigate or act upon the threats and violence, (Compl. ¶ 46), and that this custom caused Plaintiffs' harms, (Compl. ¶ 51). These pleadings would therefore appear to satisfy the *Doe* test of an "inaction theory" of municipal liability based on a custom of the municipality. However, the actors engaged in the illegal activity described in the complaint were gang members and students—private actors—and not employees of DPS. The inaction theory applies only where the municipality adopted a custom of tolerating constitutional violations by its own actors. *See Arendale v. City of Memphis*, 519 F.3d 587, 599 (6th Cir. 2008) ("Plaintiff must establish . . . the existence of a clear and persistent pattern of discrimination by municipal employees . . . ."); *Doe*, 103 F.3d at 508; *see also Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002) ("Where . . . a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm."). Moreover, *DeShaney* bars any suit against the State for failure to protect an individual from harms caused by

private actors, with two exceptions: where there is a custodial or special relationship, or a state-created danger. *See DeShaney*, 489 U.S. at 202 n.10 ("Because we conclude that the Due Process Clause did not require the State to protect [the plaintiff] from [the private actor] . . . . we have no occasion to consider . . . whether the allegations in the complaint are sufficient to support a § 1983 claim against [the municipality] under *Monell* . . . .").

Therefore, both *DeShaney* and the Sixth Circuit's "inaction theory" doctrine preclude Plaintiffs' theory of harm caused by a custom of inaction.

### b. Custodial Relationship

Plaintiffs next allege a custodial relationship, thereby invoking a theory of liability that purports to avail Plaintiffs of one of *DeShaney*'s exceptions. (Compl. ¶ 43.) However, the Sixth Circuit has considered and rejected the theory advanced by Plaintiffs on the premise of a custodial relationship between DPS and Plaintiffs. There is no custodial or otherwise special relationship between a school and its students, even where school attendance is mandated by law. *Soper v. Hoben*, 195 F.3d 845, 853 (6th Cir. 1999); *Doe v. Claiborne County*, 103 F.3d 495, 510 (6th Cir. 1996); *see Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995) ("[C]ourts have recognized that unlike imprisonment or commitment to a mental institution, compulsory school attendance does not restrict a student's liberty such that neither the child nor his parents are unable to attend to the child's basic human needs."). Plaintiffs therefore fail to state a § 1983 claim based on a theory of a custodial relationship on which relief may be granted.

c. State-Created Danger

Plaintiffs' final § 1983 theory is that, with either negligence or actual knowledge of the risks involved, DPS merged two school districts, after which "gang related violence began almost immediately." (Compl. ¶¶ 52-57.) In their response to the motion to dismiss, Plaintiffs explain that "Defendant . . . knew the combining of the high school [sic] would create gang violence, shootings and danger within Henry Ford High School. This created a dangerous atmosphere for the general student population that eventually erupted on October 16, 2008." (Pl.'s Resp. 6). DPS responds that "Plaintiffs fail to plead any affirmative acts by Detroit Public Schools that created or increased their risk of harm, [and] fail to plead any special danger to them as distinguished from the student body or public at large . . . ." (Def.'s Mot. 5 (emphasis removed).)

The elements of a claim for state-created danger are

(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)) (internal quotation marks omitted).

To satisfy the first element, "in order to establish a state-created danger under our case law, plaintiff must show that the state actor increased the risk of harm to the victim—namely, by showing that the government did more than 'merely returning a person to a situation with a preexisting danger.'" *Jones v. Reynolds*, 438 F.3d 685, 695 (6th Cir. 2006) (quoting *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003)).

11

The third element—the requisite culpability of the state—requires a showing of "deliberate indifference" on the part of the defendant. *Arledge v. Franklin County*, 509 F.3d 258, 263 (6th Cir. 2007). This means "the state actor 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must draw the inference.'" *Id.* (quoting *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 469 (6th Cir. 2006)). "However, circumstantial evidence may be used to show that 'the risk was so obvious that the official had to have known about it.'" *Id.* (quoting *McQueen*, 433 F.3d at 469).

Plaintiffs are entitled to have the court draw all reasonable inferences from their complaint in their favor, but, under *Twombly* and *Iqbal*, the court need only accept Plaintiffs' averred facts as true, and not their asserted legal conclusions. In this "context-specific task that requires the . . . court to draw on its judicial experience and common sense," *Iqbal*, 129 S. Ct. at 1950, a review of the allegations within the four corners of the complaint leads to a finding that Plaintiffs do not plead any element of the state-created danger analysis that is plausible on its face. The court therefore cannot "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.*

First, a comparison of two recent cases illustrates the difficulty courts have had in determining what constitutes an affirmative act in cases where a plaintiff alleges a failure to supervise, as Plaintiffs do here. In *McQueen*, a first-grader, Smith, brought a gun to his school and fatally shot a classmate, Doe. 433 F.3d at 462. The plaintiff alleged that "in the months leading up to the shooting, Smith was involved in several incidents where he attacked other students, sometimes beating them up and other

12

times stabbing them with a pencil." *Id.* Although the school "had a policy of expelling students possessing dangerous weapons on school grounds. . . . [the principal] never attempted to expel Smith for his attacks." *Id.* at 462-63. The plaintiff alleged that when the teacher left Smith and other students unsupervised, "she committed a *Kallstrom* affirmative act that created a risk that Doe would be harmed by Smith." *Id.* at 465. The Sixth Circuit affirmed the dismissal of the plaintiff's claim, finding no "affirmative act" and explaining that the danger "was created by Smith's possession of a gun and Doe's presence in the classroom with him." *Id.* at 466. "Doe would have faced the danger of Smith drawing his gun and firing at her even if [the teacher] had not acted (i.e., if [the teacher] had remained in the classroom at all relevant times)." *Id.*

In *Waller v. Trippett*, by way of contrast, the Sixth Circuit found an affirmative act. In that case, a prison inmate, Gerald Barnes, killed Doris Taylor, a food-service steward at the Thumb Correctional Facility (TCF) in Michigan. 49 F. App'x 45, 47 (6th Cir. 2002). TCF normally housed inmates classified as Level II inmates, but at the time of Taylor's murder it was housing persons whom the system classified as Level III or IV, including Barnes, who was "imprisoned after having been convicted of committing a criminal sexual assault with a knife," and "had a 'history of admitting to at least eight rapes, several of which were committed at knife point.'" *Id.* (quoting the complaint). The plaintiff, the personal representative of Taylor's estate, alleged that the prison's policies allowed dangerous access to knives that were "neither tethered nor secured in any manner," and that Barnes was one of those prisoners, having been assigned to kitchen duties. *Id.* "Barnes checked out a large knife. When Ms. Taylor left the cooking

13

area and went to the back offices, Barnes followed her and then, with the knife, violently stabbed her." *Id.*

The plaintiff's complaint in *Waller* further asserted that "Defendant furthered [sic] increased decedent's risk of substantial harm because he deviated from the Michigan Department of Correction's [sic] policy when he declined to station correction officers within the kitchen food preparation area." *Id.* The Sixth Circuit affirmed the district court's denial of a motion to dismiss, concluding that the decedent "was a member of a limited and specifically definable group[,] . . . that the Defendant's conduct . . . put Ms. Taylor and the other members of that group at substantial risk of serious, immediate and proximate harm[,] . . . [and] the risks were known or obvious." *Id.* at 50-51.

Thus, *McQueen* and *Waller* illustrate how a failure to supervise a private actor can be viewed as an affirmative act in one context, but not in another. Helpfully, the Sixth Circuit has provided a more rigorous analytical framework for evaluating the "affirmative act" prong, making it a question of risk analysis. "Because it is sometimes difficult to distinguish action from inaction . . . we have refined the test. Rather than focusing on the often metaphysical question of whether officer behavior amounts to affirmative conduct or not, we have focused on 'whether [the victim] was safer before the state action than he was after it.'" *Koulta v. Merciez*, 477 F.3d 442, 444 (6th Cir. 2007) (quoting *Cartwright*, 336 F.3d at 493).

Placed in this risk-assessment architecture, paragraphs 53 and 56 reveal the complaint's fatal flaw with respect to this first element. The former paragraph asserts that there was "rival gang and gang related violence in the schools" at the time of the merger, and the latter that "gang related violence began almost immediately upon the

14

merger." Although the complaint uses the word "began," it is clear, and consistent with Plaintiffs' counsel's statements at oral argument, that there was violence in the schools both before and after the schools merged. No facts alleged make a case of increased risk as a result of the merger plausible. The rest of the allegations in the complaint regarding the resulting violence are in the form of legal conclusions, bald of any factual support, that the court need not and should not accept as true under *Iqbal*. Thus, under the Sixth Circuit's precedents finding "no affirmative act that created or increased the risk [where] the victim would have been in about the same or even greater danger even if the state officials had done nothing," *McQueen*, 433 F.3d at 466, Plaintiffs have not pleaded a cognizable affirmative act.

Second, Plaintiffs have not stated a plausible claim of "a special danger to the plaintiff wherein the state's actions placed the plaintiff *specifically* at risk," *Jones*, 438 F.3d at 690 (emphasis added), because the "student population," is not a "specifically definable group" that may be distinguished from "the public at large." "In the only cases where we have recognized a 'state created danger,' the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims." *Id.* at 696 (collecting cases finding a specifically defined group); *see Koulta*, 477 F.3d at 447. "When by comparison the victim was not identifiable at the time of the alleged state action/inaction, we have held that a § 1983 suit may not be brought under the 'state created danger' theory." *Jones*, 438 F.3d at 697 (collecting cases where alleged group was not specifically defined); *see Koulta*, 477 F.3d at 447.

This second element of the state-created danger analysis poses a line-drawing problem: how "identifiable" or "definable" a group is depends on the sheer size of the

15

group, and the relationship of the members of the group to each other. Two people placed in harm's way by the state's action, regardless of their relationship, tend toward specifically definable. On the other hand, two million look less well-defined. In addition, the similarities between members of the group factor into the equation. As in *Waller*, people who work in the same space every day are linked in a way that make them specifically definable. However, vast, loosely-related segments of the public, even if in close proximity, such as in a neighborhood, are less well-defined. *See Kennerly v. Montgomery Cnty. Bd. of Comm'rs*, 257, F. Supp. 2d 1037, 1044 (S.D. Ohio 2003) ("Neighbors are still the public.") The analysis is context-specific, and while lines may be drawn, they are not bright.

In this case, the alleged group—the student body at Henry Ford High School—falls on the side of the line that is closer to the public at large than it is to a specifically defined group.[4] Henry Ford is composed of hundreds of students, and as a public high school, it has students from all sectors of the surrounding community. Because public school students are defined only by their youth, the student body at the high school is a cross-section of the public, which strongly resembles the many characteristics of the public. As a result, the student body does not constitute a specifically defined group for the purpose of the state-created danger analysis.

---

[4] At argument on the motion, Plaintiffs' counsel clarified there was no special meaning to the use of "in particular" in the complaint. (*See* Compl. ¶¶ 55, 57.) The phrase was employed vaguely, and subject to construction that might further define the Plaintiffs from the general student body. Even if the phrase were intended for such a narrowing construction, it would still lack the factual support necessary to satisfy the plausibility standard.

Finally, the complaint recites, in the insufficient conclusory fasion, "DPS knew or should have known the merger would create gang violence, shootings and danger." (*Id.* ¶ 54.) This legal conclusion is unsupported by any factual allegations regarding DPS's knowledge.

Plaintiffs have not pleaded a case of state-created danger that is plausible on its face, and DPS must be dismissed from the suit accordingly. Although Plaintiffs cursorily recite the names of the individual Defendants in certain paragraphs under Count IV, they do not allege those individuals conducted an affirmative act or had the intent required for state-created danger liability. DPS is therefore the only Defendant charged under Count IV. Thus, Count IV may be dismissed from the suit.

## IV. CONCLUSION

Accordingly, IT IS ORDERED that Plaintiffs' motion to amend/correct complaint [Dkt. # 5] is GRANTED. Plaintiffs are DIRECTED to FILE their second amended complaint **by December 27, 2010**.

IT IS FURTHER ORDERED that Defendant DPS's motion to dismiss is GRANTED. Defendant DPS is DISMISSED from the case. Count IV of the second amended complaint is also DISMISSED. Judgment in favor of Defendant DPS will be entered upon the conclusion of the case.

  s/Robert H. Cleland  
ROBERT H. CLELAND  
UNITED STATES DISTRICT JUDGE

Dated: December 13, 2010

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, December 13, 2010, by electronic and/or ordinary mail.

                                        s/Lisa Wagner
                                        Case Manager and Deputy Clerk
                                        (313) 234-5522